IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **REGIONAL AIRPORTS IMPROVEMENT CORPORATION,**<br><br>      Appellant,<br><br>  v.<br><br>**UMB BANK, N.A. As Successor Trustee, CITY OF LOS ANGELES, and UNITED AIR LINES, INC.,**<br><br>      Appellees. | **Case No. 07 C 5890**<br><br>**Hon. Harry D. Leinenweber** |

**MEMORANDUM OPINION AND ORDER**

  United Air Lines, Inc. (hereinafter, "United") operates at Terminals 7 and 8 at Los Angeles Airport ("LAX") under a lease with the City of Los Angles (hereinafter, the "City"). United improved the two terminals in the early 1980's with the proceeds of bonds issued by the Regional Airports Improvement Corporation (the "RAIC"), a governmental entity created for that purpose. UMB Bank N.A. (hereinafter, "UMB") is the current indenture trustee for these bonds. The transaction that resulted in United receiving the proceeds of the sale of the bonds consisted of several steps. United assigned to the RAIC all of United's rights and interest in the Terminal Lease "as it relate[d] and applie[d] to the RAIC Facilities," which were defined "as those facilities constructed with the bond money, a total of 345,167

square feet of the total terminal space." The RAIC "subleased" back to United the same terminal space, with rental set at an amount necessary to make payments on the bonds and to cover the RAIC's administrative costs. As additional security, the City granted RAIC a contingent lease giving it the right to occupy and re-let all of United's leasehold interests in Terminals 7 and 8.

The Bankruptcy Court held that the transactions amounted to a secured financial transaction rather than a true lease. The significance of this ruling was that had the Bankruptcy Court found that the transaction was a "true lease," United would have to "either reaffirm and be bound by the sublease" and make all rental payments, or, walk away from it and lose its entire terminal space, not just the RAIC space. Due to the re-characterization, however, United would only have to pay the "replacement value" of the sublease collateral (the RAIC facilities), *i.e.*, the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller. *Associates Commercial Corp.v. Rash,* 520 U.S. 953 (U.S.Tex., 1997). The District Court reversed the Bankruptcy Court's secured financial transaction ruling finding that the transaction was, in fact, a true lease. This ruling in turn was reversed by the Seventh Circuit in *United Airlines, Inc. v. U.S. Bank National Association, Inc., City of Los Angeles, et al (In Re United Airlines, Inc.*), 447 F.3d 504 (7th Cir., 2006)

and the transaction was once again re-characterized as a secured financial transaction.

The parties agree that the replacement value of a leasehold interest is the stream of revenue, *i.e.*, the rental payments, that it would generate over its term (in this case from 2004 to November 2021) discounted to present value. As expected, the parties disagree over both the amount of the rental payments and the discount rate to be used. UMB also disagrees with the Bankruptcy Court's decision to limit the collateral to the RAIC facilities' space rather than United's entire leasehold interest in the two terminals.

At the trial, the Bankruptcy Court held that the collateral only consisted of the space upon which the RAIC facilities were constructed rather than United's entire leasehold in Terminals 7 and 8. It also decided that the rental rate that would be generated by the RAIC facilities would be the same as the rates now in place for seven major airlines that rent space in the terminals at LAX under long-term leases that periodically require renegotiation of the rental rates similar to United's. After the latest round of negotiations, the rate that commenced in August 2004 was $16 per square foot of usable terminal space with annual increases that would raise the rate to $21 per square foot in August 2008. Thereafter, the Bankruptcy Court applied an annual rate of increase of 2.9% up to the sublease termination date of

November 15, 2021, at which time the rate would be $30.45 per square foot. In setting the discount rate, the Bankruptcy Court disagreed with the rates suggested by both United and UMB and set the discount rate to be used at 11.64% which was the midpoint between United's proffered rate of 14.37% and UMB's of 8.9%. Using these figures, the Bankruptcy Court set the discounted value of the sublease at $33,455,055. The Bankruptcy Court had previously denied UMB's request that it receive "adequate protection" to compensate it for consumption of the collateral during the pendency of the bankruptcy proceeding appeals as untimely.

UMB appeals both the rental rate and the discount rate set by the Bankruptcy Court. UMB also appeals the space limitation ruling and the denial of its post-confirmation request for adequate protection payments to compensate for consumption of the collateral during the bankruptcy case. United has cross-appealed contending that the Bankruptcy Court artificially deflated the appropriate discount rate.

## I. DISCUSSION

While a Bankruptcy Court's conclusions of law are reviewed *de novo*, *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir., 1994), its findings of fact are reviewed under a clear error standard. *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir., 2003). Valuation is a question of fact subject to the clearly erroneous

standard.  *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1232 (7th Cir., 1990).

### A.   The Scope of the Collateral

The Bankruptcy Court determined that the relevant collateral as described in the confirmed second plan was the portion of United's leasehold that was the subject of the Partial Assignment and the Facilities Sublease rather than United's entire leasehold at LAX.  UMB argues that the terminal lease allowed the Trustee to terminate the lease, evict and re-let the entire leasehold interest upon default as did the contingency lease.  However, the effect of the re-charactization of facilities' sublease was to create a leasehold mortgage securing the bond payment obligations over just the RAIC portions of the leased property.  Thus, the Trustee no longer had the right to evict and re-let; rather the trustee was limited to foreclosure and the right to foreclose was limited to the RAIC portions of the leased property.  Thus the scope of the collateral was the 345,167 square feet upon which the total RAIC facilities were located, rather than the total leasehold estate held by United at terminals 7 and 8.  Initially United argued that the collateral should not even include the so-called City Areas, *i.e.*, the areas the City controls and maintains on the RAIC portion of the leased property.  The Bankruptcy Court, however, correctly included the City Areas into the leasehold estate subject to foreclosure because they

obviously give value to the United areas, *e.g.*, the rest rooms, public corridors, concessions, etc. United appears to have dropped its objection to this portion of the ruling. The Court finds that Bankruptcy Court's conclusion that the scope of the collateral is the entire area encompassed in the Facilities Sublease, but not more, is not clearly erroneous to the extent that it was a factual question. To the extent that the finding constitutes a legal conclusion it is correct.

### B.  The "Annual Rent" for the Collateral

The parties agree that the Bankruptcy Court correctly concluded that the value of the Trustee's Collateral is the discounted stream of rental income that the Collateral could generate in the market during the term of the leasehold. UMB, however, strenuously disagrees with the methodology the Court used in arriving at the annual rental. The Bankruptcy Court agreed with United that the rent paid by the major airlines, who rent space at LAX under long-term leases similar to United's which had been renegotiated in 2005 and 2006, were "useful" comparables as to what an entity such as United would have to pay as rental for like property from a willing seller. Thus, the Bankruptcy Court adopted the schedule of rent that was in place for the airlines that held long-term leaseholds, which was $17 per square foot for usable areas, rising to $21 per square foot by August 2008. UMB initially argues that these rents are

subsidized by the City because at the time it entered into the long-term leases the City was concerned with encouraging airlines to invest in terminal improvements and charged rents on a "residual cost recovery basis", *i.e.*, the airlines paid rent equal to the City's costs in maintaining the terminals.  If the City's costs were lower than the rent, the airlines would receive a rebate; if they were higher, the airlines would receive an assessment.  Therefore, they cannot constitute market rates.  However, as the Bankruptcy Court found, the evidence allows the conclusion that LAX, at least in the latest round of negotiations, has changed to a market approach, which resulted in the $17 figure.

UMB argues that a much better comparable would be the rental's charged by LAX2, a not-for-profit entity owned by three airlines, that leases Terminal 2 from LAX, and then sublets specific gates and other areas on a fee-for-use basis.  It contends that such an entity could be found that would be interested in running United's terminal space under a similar arrangement.  UMB's expert concluded that the market rental established by LAX2 was $63 per square foot.  The Bankruptcy Court did not accept the expert's conclusion, and found that "it was inappropriate to use the net revenues as a measure of market rent" and that there was no evidence submitted of what internal rate of return a hypothetical LAX2 operator would require.  The

Court also found that there were significant gaps identifying projected revenues and expenses which would make a square footage rental determination highly speculative.  While the Court agrees with the Bankruptcy Court on these criticisms, the Court finds that the most persuasive reason for discounting the LAX2 model as a comparable is scaling:  the RAIC facilities include at most 7 gates out of the 20 gates in United's terminal facilities (United claims it is only 4 gates).  The ratio of costs to revenue in operating a few gates in a terminal would not be the same as the ratio in operating an entire terminal as is the case with LAX2. Would a bidder on the RAIC facilities upon which are located either 4 gates out of 20 (United) or 7 out of 20 (UMB) pay the same amount as a bidder who would acquire 20 gates if the entire United leasehold was for sale?  The answer is obviously no. Finally, UMB argues that after the District Court reversed the Bankruptcy Court's decision that the lease agreement was a security agreement in favor of a finding that it was a true lease, United committed to assume the sublease and make all defaulted rent payments, which commitment was valued at approximately $75 million. However, *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997) held that determination of replacement value was an objective one, and not what a specific debtor might subjectively feel was necessary.  The fact that LAX charges $17 per square foot for similar leaseholds is objective

evidence what a willing lessor would pay. What United might be willing to pay to salvage 20 gates (not just the four or seven in the RAIC facility space) is not. It must be remembered that what is being evaluated is air terminal space which, as the Bankruptcy Court pointed out, is not a fungible commodity like an automobile but is instead a very unique asset. What is at issue is what a willing buyer in the debtor's trade, *i.e.*, an airline or terminal operator, would pay to a willing seller, in this instance an airline terminal building owner, which in all probability would be a public entity. The Court finds that the Bankruptcy Court was not clearly erroneous in making the factual determination that the negotiated rentals at LAX charged to airlines similarly situated to United is the appropriate figure to determine the stream of income, and in refusing to accept the LAX2 model.

### C.  The Discount Rate

United's expert offered as the discount rate the industry wide cost of capital as reported by Ibbotson Associates, an investment research firm. Ibbotson used a specific subcategory of 17 airlines which it believed to be a good indication of the risk associated with dealing with an airline. The discount rate that it concluded to be applicable was 14.37%. This Court agrees with the Bankruptcy Court, however, in the belief that the discount rate suggested by Ibbotson overestimates the risk of an airline terminal lease that provides for termination, eviction

and re-letting.  Providing capital to individual airlines carries a greater risk because an airline failure would lead to a total loss of capital while an airline default on a lease would not lead to a complete loss of investment because the space could be re-let to another airline.  UMB on the other hand suggested a discount rate of 8.7% blended from two sources:  the taxable yield from General Obligation Airport Revenue Bonds (the "GARBs") and an informal survey of warehouse developers regarding their expected rate of return from a project at LAX.  This Court agrees with the Bankruptcy Court who felt that GARBs involved totally different risks than a lessor of air terminal space would face.  GARBS are obviously less risky because of the much greater diversification associated with them because they are paid off through revenue sources from a wide variety of terminal entities and activities.  The expected return of warehouse developers is in the nature of comparing apples with oranges since the expected use of the space in question is terminal space and not warehouse space.  The Bankruptcy Court heard each of the experts testify and its findings in these respects are not clearly erroneous.

In disregarding the suggested discount rates of both of the parties the Bankruptcy Court believed that a true measure of risk lay between the two and set the discount rate at the midpoint 11.64%.  The Bankruptcy Court was not obligated to accept one rate or the other.  In finding that the correct discount rate lay

somewhere in between the two rates suggested the parties, the one being too high and the other too low, taking the mid point is a reasonable determination and not clearly erroneous. The Court affirms the Bankruptcy Court's establishment of the discount rate at 11.64%.

### D. Inadequate Protection

UMB raises one last point. It contends that the Bankruptcy Court improperly denied it adequate protection, in that during the three years that the bankruptcy case was pending, United continued to use the collateral without making any payments to the Trustee. This amounted to avoidance of $13.7 million in rent or 17% of the remaining lease term. The Bankruptcy Court's reasoning in denying the claim was (1) that adequate protection can be granted only prospectively from the date of a motion seeking it and thus plan confirmation, which had already occurred when UMB made it request, moots all adequate protection requests, and (2) the Plan was *res judicata* with respect to all of the Trustee's claims, including the one for adequate protection. The Plan specifically described the Trustee's security interest and stated that the balance of its claim which it might have over and above the value of the security was unsecured. A bankruptcy court's interpretation of a confirmed plan shall not be overturned unless the record clearly shows an abuse of discretion. *In Re Matter of Weber*, 25 F.3d 413, 416 (7th Cir.,

1994). This was also the holding of this Court in *HSBC Bank USA v. United Airlines, Inc. (In re UAL Corp.)*, No. 07 C 1372 (N.D.Ill., March 25, 2008). The Court finds that the Bankruptcy Court's denial of adequate protection was not clearly erroneous so as to be an abuse of discretion.

### E. Rental Rate

The final matter to be decided on this appeal is the matter raised by the RAIC in a slightly different position than that taken by UMB: that the Bankruptcy Court erred in concluding that the rental rate that United pays to the City under its Terminal Lease constitutes the market rental rate for the RAIC facilities because, it argues, the Terminal Lease expressly excludes the value of the Lessee's improvements from fair rental value of the demised premises, therefore the RAIC improvements financed by the revenue bonds are not included in the court's rental value of $17 per square foot. However, as the Bankruptcy Court specifically found, although United does not pay rent on the value of the improvements it made to the RAIC facilities thus leading to a lower rental payment to the City, nevertheless the rental United pays on the surrounding property, *i.e.*, the non-RAIC property, at $17 per square foot which it uses for the same purposes, *i.e.*, gates, passenger holding areas, baggage areas, etc., is not below market. In addition, the Bankruptcy Court did find that the other carriers pay the same rent, $17 per square foot, on usable

space, *i.e.*, gates, holding areas, etc., that they did not improve. So the finding of the Bankruptcy Court is not clearly erroneous.

## II. CONCLUSION

For the reasons stated herein, the Judgment of the Bankruptcy Court is affirmed.

**IT IS SO ORDERED.**

    Harry D. Leinenweber, Judge
    United States District Court

**DATE:** June 25, 2008